**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4283-19

JEFFREY PARRELLA,
on behalf of himself and
all others similarly situated,

     Plaintiff-Appellant,

v.

SIRIUS XM HOLDINGS, INC.
d/b/a SIRIUS XM SATELLITE
RADIO, SIRIUS XM RADIO INC.,
and JAMES E. MEYER,

     Defendants-Respondents.

_____

Argued November 9, 2021 – Decided January 18, 2022

Before Judges Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket Number L-1207-19.

Andrew R. Wolf argued the cause for appellant (The Dann Law Firm, PC and The Law Office of Henry P. Wolfe LLC, attorneys; Andrew R. Wolf, Bharati O. Sharma and Henry P. Wolfe, on the briefs).

Harry P. Morgenthau (Kramer Levin Naftalis & Frankel LLP) of the New York bar, admitted pro hac vice, argued the cause for respondents (Robinson Miller LLC, Harry P. Morgenthau, Mark A. Baghdassarian (Kramer Levin Naftalis & Frankel LLP) of the New York and Connecticut bars, admitted pro hac vice, and Aaron M. Frankel and Eileen M. Patt (Kramer Levin Naftalis & Frankel LLP) of the New York bar, admitted pro hac vice, attorneys; Michael J. Gesualdo, Mark A. Baghdassarian, Aaron M. Frankel, Eileen M. Patt, and Harry P. Morgenthau, on the brief).

PER CURIAM

Plaintiff, in his individual capacity and on behalf of a putative class action, filed a complaint against defendants, satellite radio providers,[1] alleging they falsely advertised discounts to induce consumers to reactivate their Sirius radio devices. Defendants moved to dismiss the action and compel arbitration under the parties' customer agreement (agreement). The trial court granted the motion, finding mutual assent to the arbitration clause was implied from plaintiff's "usage—payment, usage of [defendants'] service, [and] extended relationship history [with defendants] . . . ." Therefore, the arbitration agreement was enforceable. We affirm.

---

[1] Defendant James E. Meyer is the Chief Executive Officer of Sirius XM Holdings, Inc. We refer to the entities and individual collectively as defendants.

A-4283-19

## I.

In December 2017, plaintiff received a mailed advertisement from defendants offering three years of defendants' satellite radio service for a discounted price of $99.00. The offer contained the following language: "See our Customer Agreement for complete terms." According to Catherine Petra, defendants' Vice President, defendants sent plaintiff this advertisement to incentivize him to reactivate his 2009 Jeep Grand Cherokee radio receiver.

Plaintiff has utilized defendants' services for many years. In 2005, plaintiff purchased services for two portable radios (the 4180 account and 6008 account). In 2009, plaintiff received a free trial subscription when he purchased his Jeep Grand Cherokee, and subsequently purchased a subscription after the expiration of the free trial (the 1453 account). Plaintiff terminated his 6008 account in 2008, his 1453 account in 2010, and his 4180 account in 2011.

When plaintiff purchased a Toyota Highlander in 2017, it included a free three-month trial subscription. Plaintiff did not renew the subscription at the end of the free trial period.

When plaintiff received the promotion from defendants in December 2017, he went to defendants' website and attempted to reactivate his 1453 account previously used in his 2009 Jeep Grand Cherokee. However,

3

defendants' website did not allow him to purchase that plan. Instead, the website directed him to choose from a list of different and more expensive service plans.

After calling defendants' service number, the service representative informed plaintiff that the three-year, $99.00 promotion was not available for his 2009 Jeep Grand Cherokee. The service representative stated:[2]

> Okay. Well I tried double-checking just with my supervisor and the offer for—I mentioned earlier that we don't usually have this offer, the $99 for three years. It's actually radio-specific, that's the reason why I checked the radio ID several times with you . . . . I'm not showing here . . . an option for the three years for $99.

Plaintiff responded, stating, "I don't know what you're telling me. I have it in my hands . . . . Just so you know, what you're doing is illegal . . . ." Plaintiff requested the assistance of a supervisor. Defendants' service representative responded that they would "bring this issue to the higher department . . . and [will] mak[e] a note on this." When the representative asked plaintiff if he wanted to purchase a different service subscription for his Jeep, the following exchange took place:

---

[2] The call was recorded. Defendants attached a transcript of the call as an exhibit in support of their motion to dismiss the complaint and compel arbitration.

A-4283-19

[DEFENDANTS' REPRESENTATIVE:] So you would still want to activate [the radio subscription] with the offer for 12 months for $60?

[PLAINTIFF:] Sure. Well, yes and no. Like I said, I'll activate it now but that I'm assuming it will be corrected [to three years for $99.00] because I'm holding a valid offer in my hands, so—

[DEFENDANTS' REPRESENTATIVE:] Sure.

. . . .

[DEFENDANTS' REPRESENTATIVE:] After fees and taxes, that will be . . . $73.18 and we will charge you [o]n February 8, [2018]. Okay you still have two months to . . . make some changes, and you have a trial for two months.[3] And I will escalate this issue to the higher department so they . . . will know what happened. Okay?

[PLAINTIFF:] Thank you.

Plaintiff provided his credit card information for the billing. The representative repeated the details of the service selected by plaintiff:

[DEFENDANTS' REPRESENTATIVE:] The 12 months select plan you chose starts at the end of your trial on February 8, 2018. Your bill is $73.04 for the initial billing . . . . Your service will automatically renew on February 8, 2019. Your renewal will bill every month at the current rate for an estimated total charge of $19.46, which includes fees and taxes. You

_____

[3] Defendants gave plaintiff a two-month trial period before his credit card would be charged and the one-year subscription period would begin. Therefore, his subscription period did not start until February 2018.

A-4283-19

may cancel at any time by calling us . . . .  <u>Your customer agreement can be found on our website, Siriusxm.com, or you can request it at any time by phone</u> . . . .  Do you accept these terms, and may I have your permission to charge your card for $73.04 at the end of your trial on February 8, 2018 minus any credits on your account and for all future charges?

[PLAINTIFF:] Uh, yes, with the reservation of—that I have mentioned before.  But yes.

[(emphasis added)].

Plaintiff's credit card was charged as described.  He did not hear back from defendants regarding his "reservation," nor did he contact defendants at any time over the next year.

Defendants sent plaintiff a welcome kit that included the agreement. Corporate records reflected the agreement was mailed on December 28, 2017, and the estimated arrival date at plaintiff's address was January 10, 2018,— before the paid subscription period began and before plaintiff's credit card was charged. On the envelope was written "IMPORTANT SUBSCRIBER INFORMATION INSIDE."  At the bottom of the cover letter, it stated: "See our Customer Agreement enclosed or online at www.siriusxm.com.  Please be sure to read it."

A-4283-19

The agreement stated: "This Customer Agreement . . . applies to [each] paid, trial, or other subscription . . . in the Service Area . . . and [on] the website . . . available to [s]ubscribers and others at www.siriusxm.com."

> IF YOU DO NOT ACCEPT [THE AGREEMENT'S] TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR SUBSCRIPTION. IF YOU DO NOT CANCEL YOUR SUBSCRIPTION WITHIN THREE BUSINESS DAYS OF THE START OF YOUR PLAN, IT WILL MEAN THAT YOU AGREE TO THIS AGREEMENT WHICH WILL BE LEGALLY BINDING ON YOU.

The agreement's arbitration provision labeled "**RESOLVING DISPUTES**" is located in the second column of the brochure. It states:

> ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. BY AGREEING TO ARBITRATION, YOU ARE HEREBY WAIVING THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR, OR A PANEL OF ARBITRATORS, INSTEAD OF A JUDGE OR JURY. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND TO HAVE A JUDGE OR JURY DECIDE THEIR CASE, BUT THEY CHOOSE (BY THEIR ACCEPTANCE OF THIS AGREEMENT, IN ACCESSING OR USING THE SERVICE OR THE SITE) TO HAVE ANY DISPUTES RESOLVED THROUGH ARBITRATION.

A-4283-19

Under the agreement, the parties must, prior to arbitration, engage in "Informal Claim Resolution" by sending a mailed notice of a dispute to defendants. "If [defendants] cannot resolve a [c]laim informally, including any [c]laim between us . . . then these [c]laims shall be resolved, upon election by either party, exclusively and finally by binding arbitration." The agreement also stated that all claims are subject to arbitration and "[i]f either party elects to resolve a claim by arbitration, that [c]laim shall be arbitrated on an individual basis."

Defendants also mailed plaintiff a welcome kit with the agreement when he opened the 1453 account for his Jeep Grand Cherokee in 2009 and the account for his Toyota Highlander purchased in 2017. Plaintiff did not recall ever receiving a welcome kit containing an agreement for either account. He also certified he had "never read and was never aware of a set of standardized terms and conditions that [defendants] cal[l] [an agreement.]" As stated, the identical agreement was also available online on the SiriusXM website.

Plaintiff did not cancel his radio service subscription during the 2018 term of agreement, and he continued to use the service. On December 14, 2018, defendants mailed an automatic subscription renewal notice to plaintiff for his 1453 account. The notice advised that plaintiff's subscription service would

8

renew monthly beginning on February 8, 2019 and provided the monthly charge. Additionally, plaintiff was informed if he wanted to "review or make changes to [his] account, [he] can visit sirusxm.com/myaccount anytime." Plaintiff was also instructed to "see our [agreement] . . . for complete terms, our refund policy, and how to cancel." And, the renewal notice provided that if plaintiff did "not wish to be charged for [his] subscriptions, [he] must cancel prior to renewal." Plaintiff did not cancel the subscription and continued to pay the monthly charge after the renewal date.

## II.

In June 2019, plaintiff filed a complaint relating to his 1453 account subscription, alleging that defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -20, the General Advertising Regulations, N.J.A.C. 13:45A-9.1 to -9.8, and the Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. 56:12-14 to -18. Defendants moved for dismissal of the complaint and to compel arbitration under the agreement.

In a comprehensive oral opinion placed on the record over two dates in June 2020, the trial judge noted the fifteen-year relationship plaintiff had with the use of defendants' services. He also stated:

> Plaintiff's arguments that he did not notice, did not understand, did not read, does not recall the multiple

9

notices [defendants] sent him that his subscription was governed by [the agreement] all fail because the law makes [it] clear that a customer cannot bury his head in the sand to avoid a valid arbitration case.

The court further noted: "Plaintiff received multiple copies of defendants['] [agreement], including the one he received just three months before reactivating his subscription in December 2017, and consistently used the service under the [agreement] without objecting to any of its terms." The judge pointed out that plaintiff did not dispute receiving the hard copies of the agreement in the mail at any time but instead said he could not recall receiving the mailed notices.

The judge found mutual implied assent existed to support the enforcement of the arbitration clause, "including usage—payment, usage of the service, [and] an extended relationship history for an extended period of time . . . ." The court found the arbitration clause was "conspicuous and very clear" and encompassed plaintiff's claims. Therefore, he granted defendants' motion to compel arbitration and dismissed the complaint.

III.

On appeal, plaintiff contends the trial court erred in finding he impliedly assented to the terms of the agreement. He also asserts the agreement is facially

deficient under the Plain Language Act (PLA), N.J.S.A. 56:12-1 to -13. We are not persuaded by either contention.

We review de novo a trial court's order compelling or denying arbitration. Skuse v. Pfizer, Inc., 244 N.J. 30, 46 (2020); Goffe v. Foulke Mgmt. Corp., 238 N.J. 191, 207 (2019). Therefore, we "need not defer to the interpretative analysis of the trial . . . courts unless we find it persuasive." Skuse, 244 N.J. at 46 (citing Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 316 (2019)). "In reviewing such orders, we are mindful of the strong preference to enforce arbitration agreements, both at the state and federal level." Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013).

## A.

We begin with the mutual assent issue. All contracts, including arbitration agreements, "must be the product of mutual assent, as determined under customary principles of contract law." Atalese v. U.S. Legal Servs. Grp., L.P., 219 N.J. 430, 442 (2014) (citation omitted). Mutual assent is found where the parties manifest an intention to be bound by the contract's essential terms. Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435-36 (1992). Arbitration agreements are subject to the same general principles of contract law and are not subject to "more burdensome treatment than other waiver-of-right clauses under

11

state law." Atalese, 219 N.J. at 444.  Therefore, an arbitration provision, as with any other waiver-of-rights clause, "must be clearly and unmistakably established."  Ibid. (citing Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001)).

Through his interactions with defendants over fifteen years, plaintiff manifested an intention to be bound by the agreement's terms, including the submission of any dispute to arbitration.  He agreed to and used several trial and full-price service subscriptions and cancelled several accounts.  Upon the acceptance of each trial and paid subscription use, defendants provided plaintiff with a hard copy welcome kit containing the agreement governing the parties' relationship.

In December 2017, when plaintiff reactivated his radio service, he agreed to a year-long subscription service and provided defendants with his credit card information for payment.  When reactivating plaintiff's account, defendants' service representative verbally informed plaintiff that the agreement could be found on defendants' website or plaintiff could request a copy of the agreement by phone.  Plaintiff was also informed if he did not want to be bound by the agreement, he could cancel at any time.  Plaintiff was familiar with the cancellation process as he had previously terminated several accounts.

A-4283-19

Defendants also sent plaintiff the agreement in a welcome kit on December 28, 2017. When the contract expired, plaintiff renewed it and continued paying the monthly bill.

Plaintiff does not dispute he received the agreement. He had sufficient notice of the arbitration provision contained in the agreement. Defendants had mailed two prior welcome kits containing the agreement and arbitration provision in connection with plaintiff's prior use of their services. Plaintiff's actions of requesting defendants' services, using those services, and paying for them after receiving the agreement demonstrates his assent to the contractual relationship established under the agreement. As our Court stated in Weichert, a person may manifest "assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact." 128 N.J. at 436 (emphasis added). The totality of plaintiff's actions over the fifteen-year relationship with defendants establishes implied assent.

### B.

Plaintiff also asserts the arbitration provision is not enforceable because it is deficient under the PLA. He contends the agreement's font is less than 10-point type and does not sufficiently explain he is waiving his rights under the arbitration provision. We disagree.

13

The PLA does not mandate any specific language, font size, or format, but rather lists factors for a court to consider when determining whether a consumer contract is compliant with the Act. The agreement here does not offend any of the listed factors. The PLA also provides guidelines that a court may consider in reviewing a consumer contract—one guideline is that "[c]onditions and exceptions to the main promise of the agreement . . . shall be in at least 10 point type." N.J.S.A. 56:12-10(b)(3).

The agreement's arbitration provision is labeled, bolded, and contains the heading "RESOLVING DISPUTES." It is located in the second column on the front page of the agreement. And, although defendants concede the font of the agreement contained in the welcome kit is approximately 6.75-point type, the PLA does not require an agreement to be at least 10-point type. It is a guideline for courts to consider. Moreover, the agreement was also available to review online, as defendants' service representative advised plaintiff. That agreement may be viewed in any size font convenient for a consumer. The agreement contained in the welcome kit and on defendants' website did not violate the PLA.

The arbitration provision informed plaintiff he was waiving his right to go to court and to have a jury resolve his dispute. In clear, simple language, the clause stated that any dispute would be resolved by binding arbitration. An

A-4283-19

arbitration agreement does not need to include any specific set of words but "must explain that the plaintiff is giving up [their] right to bring [their] claims in court or have a jury resolve the dispute." Atalese, 219 N.J. at 447.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4283-19